UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ROSE MARIE SOILEAU                    CIVIL ACTION NO. 6:15-cv-02634

VERSUS                                JUDGE HANNA

U.S. COMMISSIONER,                    BY CONSENT OF THE PARTIES
SOCIAL SECURITY
ADMINISTRATION

## MEMORANDUM  RULING

Before the Court is an appeal of the Commissioner's finding of non-disability.

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the

parties consented to have this matter resolved by the undersigned Magistrate Judge

(Rec. Doc. 7-2), and this matter was referred to the undersigned Magistrate Judge for

all proceedings, including the entry of judgment (Rec. Doc. 7).   Considering the

administrative record, the parties' briefs, and the applicable law, the Commissioner's

decision is affirmed.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Rose Marie Soileau, fully exhausted her administrative remedies

before filing this action.   She filed an application for disability insurance benefits

("DIB"), alleging disability beginning on April 21, 2011.[1]   Her application was

---

[1]        Rec. Doc. 5-1 at 124.

denied.[2]   She requested a hearing,[3] which was held on February 26, 2014 before

Administrative Law Judge Carol L. Latham.[4]  The ALJ issued a decision on May 21,

2014,[5] concluding that the claimant was not disabled within the meaning of the Social

Security Act from April 11, 2011 through the date of the decision.  The claimant

asked for review of the decision,[6] but the Appeals Council concluded that there was

no basis for review.[7]  Therefore, the ALJ's decision became the final decision of the

Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).

The claimant then filed this action, seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on August 21, 1959.[8]  At the time of the ALJ's decision,

she was fifty-four years old.  She obtained a high school equivalency diploma,[9]

---

[2]    Rec. Doc. 5-1 at 62.

[3]    Rec. Doc. 5-1 at 84.

[4]    Rec. Doc. 5-1 at 38-61.

[5]    Rec. Doc. 5-1 at 20-32.

[6]    Rec. Doc. 5-1 at 16.

[7]    Rec. Doc. 5-1 at 4.

[8]    Rec. Doc. 5-1 at 40, 124.

[9]    Rec. Doc. 5-1 at 42, 149.

completed two years of vocational training in medical transcription,[10] and has relevant work experience as a Medicaid biller, secretary, receptionist, and transcriptionist in a hospital and in doctors' offices.[11]  She alleges that she has been disabled since April 21, 2011[12] due to back surgery, knee surgery, mitral valve prolapse, aortic spasms, stomach pain, arthritis, memory problems, depression, and a cervical disk fusion that makes her unable to keep her head down for more than an hour.[13]

On January 11, 2011, the claimant saw Dr. M. Lawrence Drerup of Alexandria Neurosurgical Clinic for a neurosurgical consultation.[14]  She reported that she had experienced mild neck discomfort with some numbness and tingling in her right arm for about five years, which became severe after wrapping Christmas presents on December 10, 2010.  She described pinching, hurting, sharp pain and pressure, extending from her lower cervical spine into the interscapular region and extending up into the occipital region, provoking headaches.  She complained of daily headaches since the onset of pain.  She denied any new numbness, tingling, or weakness in her arms but had persistent right arm tingling in a C7 dermatomal pattern

---

[10]     Rec. Doc. 5-1 at 42, 149.

[11]     Rec. Doc. 5-1 at 42, 150, 173.

[12]     Rec. Doc. 5-1 at 124.

[13]     Rec. Doc. 5-1 at 148.

[14]     Rec. Doc. 5-1 at 288-294.

-3-

as well as intermittent weakness in her left arm.  She rated her pain as 2 out of 5 and stated that her pain worsens with activity and driving.  She complained of severe pain when turning her head from side to side and stated that this causes a headache.  She was treated with analgesics and a Prednisone dosepak, which improved her pain for about one week, but the pain returned and was worsening.  In addition to neck pain, the claimant reported stomach pain, urinary stress incontinence, constipation, thyroid problems, mitral valve prolapse, depression, sleep apnea, a nervous stomach, gallbladder trouble, and asthma.  She reported having had tonsil and adenoid surgery, thyroidectomy, cholecystectomy, appendectomy, hysterectomy with removal of the fallopian tubes and ovaries, Ceasarean section, and lumbar spine surgery.

Dr. Drerup's physical examination of the claimant showed decreased strength in her left biceps and decreased triceps reflexes.  Hoffman's sign was present in her right arm.  Dr. Drerup noted that an MRI of the cervical spine performed on December 13, 2010 showed a large disc herniation at C6-7.  Following discussion, the claimant indicated that she wanted to proceed with surgery.  Preganglionic nerve conduction studies of the arms were performed, which were normal.

A cervical MRI was obtained on January 20, 2011 at Central Louisiana Surgical Hospital.[15]  The MRI showed multilevel degenerative disc disease with a left

---

[15]     Rec. Doc. 5-1 at 232-233.

paracentral disc extrusion at the C6-7 level, causing severe spinal canal stenosis and mild deformity of the spinal cord as well as mild spinal canal stenosis at C5-6.

The claimant again saw Dr. Drerup on January 20, 2011.[16]  He reviewed the MRI findings.  His plan was to perform an anterior cervical discectomy and fusion at C6-7 with anterior cervical fixation.  The surgery was performed on January 26, 2011,[17] and the claimant was discharged from the hospital with a prescription for Lorcet Plus and instructions to follow up with Dr. Drerup in a week.

The claimant returned to Dr. Drerup on February 10, 2011.[18]  She indicated that she had done quite well since surgery and had no neck or arm pain.  Range of motion in the cervical spine was mildly limited in lateral rotation bilaterally but was otherwise unremarkable.  X-rays of the cervical spine showed the spinal fusion.

The claimant saw Dr. Drerup again on March 24, 2011.[19]  X-rays showed a solid fusion, and the claimant reported only mild posterior cervical soreness. Voltaren Gel was prescribed for that complaint.

---

[16]     Rec. Doc. 5-1 at 219-221.

[17]     Rec. Doc. 5-1 at 222-226, 280-282.

[18]     Rec. Doc. 5-1 at 277-279.

[19]     Rec. Doc. 5-1 at 273-276.

On December 14, 2011, the claimant underwent arthroscopic surgery on her right knee, following failed conservative treatment including two injections.[20]

The record contains no evidence that the claimant visited Dr. Drerup between March 2011 and February 2013, a period of almost two years.  When the claimant returned to Dr. Drerup on February 7, 2013,[21] she reported intermittent, progressive, lower posterior cervical pain radiating into her right arm and hand with tingling and numbness of her left hand but no left arm pain.  She stated that her symptoms began two to three months earlier after lifting a grandchild and affected her sleep.  X-rays showed a stable postsurgical cervical spine and mild degenerative changes at C4-5 and C5-6.  Her gait and posture were normal, there were no paraspinal muscle spasms, and her strength and sensation were normal in both arms.  Dr. Drerup diagnosed status post anterior cervical discectomy and fusion at C6-7 with a solid anterior cervical fixation, posterior cervical pain with bilateral upper extremity sensory changes of unclear etiology with known mild cervical spondylosis at C5-6, history of mitral valve prolapse, status post lumbar spine procedure performed many years ago, chronic use of aspirin, and a stated allergy to Sulfa drugs.  He planned to

---

[20]      Rec. Doc. 5-1 at 235-238.

[21]      Rec. Doc. 5-1 at 267-294.

obtain preganglionic nerve conduction studies of her arms and an MRI of the cervical spine.

The cervical MRI obtained on February 18, 2013[22] showed interval anterior discectomy at C6-7 with relief of central stenosis.   It also showed degenerative changes at other levels with facet arthropathy but no significant stenosis.  The EMG of the same date was normal.[23]

On February 26, 2013, the claimant was examined by Dr. Michael A. Hall at the request of Disability Determination Services.[24]  The claimant gave Dr. Hall a detailed history including lumbar spine surgery in 2001, cervical spine surgery in 2011, right knee surgery in 2011, a diagnosis of mitral valve prolapse in 1992, ulcers, nervous stomach, a diagnosis of major depressive disorder in 2007 for which she takes medication, chest pain, and spasms of the aorta.  She stated that in the previous six to twelve months, she had no lumbar problems but subjective crepitus in her posterior cervical spine with sharp cramping pain and radiation to the arms, greater on the right than the left.  She stated that she had an MRI on February 18, 2013 and was scheduled for an EMG.  Physical examination revealed a normal range of motion

---

[22]      Rec. Doc. 5-1 at 265-266.

[23]      Rec. Doc. 5-1 at 263-264.

[24]      Rec. Doc. 5-1 at 242-245.

in the lumbrosacral spine and cervical spine, appropriate strength in the upper and lower extremities, normal fine and gross dexterity, and no evidence of sensation or motor abnormality in the upper or lower extremities.  Dr. Hall also found that the claimant had a normal range of motion in both knees without tenderness to palpation. The claimant was able to bear weight on her toes and heels and to do heel-to-toe maneuvers, spinning, and squatting.  Dr. Hall did not detect an auscultative murmur upon examination of the claimant's heart, and he found no end-organ damage secondary to her mitral valve prolapse.  Dr. Hall detected no enlargement of the claimant's stomach, no rebound, guarding, or fluid waves during examination.  He also found no clinical evidence of memory loss.  The claimant told Dr. Hall that she can dress and feed herself, can stand for thirty minutes at a time and for four hours of a work day, can walk on level ground for twenty minutes, and can sit for thirty minutes at a time.  She stated that she can lift twenty pounds, can drive for two hours, can sweep, shop, mop, climb stairs, vacuum, cook, and do dishes.  Dr. Hall concluded that there was no clinical evidence of a decrease in functionality secondary to the claimant's alleged impairments.

Two days later, on February 28 2013, the claimant returned to Dr. Drerup.[25] She complained of low posterior cervical pain radiating into the right trapezius, the

---

[25]     Rec. Doc. 5-1 at 260-262.

right shoulder, the posterior aspect of her right upper arm, and the lateral aspect of her right forearm and thumb.  She also reported numbness and tingling in her right hand primarily affecting the thumb.  She stated that her symptoms worsened when lying supine or working overhead, and the pain affected her sleep.  Her gait and posture were normal, there was no paraspinal muscle spasm, strength in her arms was normal, and the nerve conduction studies were normal.  Dr. Drerup's plan was to perform a diagnostic and therapeutic selective nerve root block at C6.  The nerve root block was performed on March 8, 2013.[26]

At the claimant's next visit with Dr. Drerup on April 4, 2013, she reported that she no longer had neck or right arm pain but still had numbness in her right hand. The numbness was more pronounced at night and affected her sleep patterns.

The claimant returned to Dr. Drerup's office on June 6, 2013.[27]  She was continuing to experience numbness and tingling in her right hand.  Dr. Drerup noted that an EMG and nerve conduction study of the arms performed on May 16, 2013 showed severe and significant right carpal tunnel syndrome and mild carpal tunnel syndrome on the left.  He also noted a positive Phalen's sign and a positive Tinel's sign.  Dr. Drerup recommended that the claimant use bilateral wrist splints.  His

---

[26]      Rec. Doc. 5-1 at 259.

[27]      Rec. Doc. 5-1 at 253-255.

diagnoses were:  status post anterior cervical discectomy and fusion C6-7 with anterior cervical fixation, C6 radiculopathy right worse than left secondary to mild cervical spondylosis at C5-6 (improved with selective root block at C6 bilaterally), history of mitral valve prolapse, status post lumbar spine procedure performed many years ago, chronic use of aspirin, stated allergy to Sulfa drugs, severe carpal tunnel syndrome on the right, and mild carpal tunnel syndrome on the left.

On February 26, 2014, the claimant testified at a hearing regarding her symptoms and her medical treatment.  At that time, she was taking the following prescription medications:  Protonix and Reglan for her stomach, Synthroid for her thyroid, Norvasc and Toprol for mitral valve prolapse, Buspar for anxiety, Effexor for depression, Estrotest for hormones, Vitamin E for breast problems, Aspirin for her heart, Ibuprofen as needed for pain, Celebrex as needed for arthritis, and Imetrex as needed for migraine headaches.

The claimant testified that she returned to work as a Medicaid biller for a hospital following cervical spine surgery but was unable to perform her job duties, which included extensive use of a computer to enter data, typing, and using the telephone.  She stated that holding the telephone, typing, writing, and holding her head down to read and type caused neck pain and headaches.  Although she altered her work station at her own cost by raising her monitor, using a stand for her papers,

and slanting her keyboard, these changes resulted in only minor improvement in her symptoms.  She tried using a speakerphone, but this disrupted her coworkers, and her employer did not offer her a headset.  Her productivity slowed, and she took more frequent breaks.  Headaches interfered with her ability to stay on task, and she had to leave work early and miss work due to migraine headaches.  Lying down and applying an ice pack to her neck after work were helpful, but she said her doctor told her that the problems she was having at work were an expected effect of the cervical surgery because keeping her head down puts pressure on the fusion site.  After six to eight weeks, she concluded that she was unable to do the job and voluntarily terminated her employment.

The claimant reported that, since leaving work, she lies down for approximately one hour most days to help alleviate neck pain; when she does not, her neck pain increases.  She explained that driving for more than thirty to forty-five minutes is painful, and that she cannot turn her head from side-to-side but must turn her whole body instead.  She reportedly purchased a recliner with specific pillows to hold her head up.  She testified that any type of activity can trigger neck pain, so she limits her activities to no more than an hour in length.  She still does her housework, but had to acquire a lightweight vacuum cleaner, a different style of mop, and a lighter purse.  She still does her grocery shopping but carries only a few light bags at

a time.  She stated that neck pain interrupts her sleep, and stress causes chest pain due to mitral valve prolapse.  She stated that the nerve block injection "helped a good bit" but lasted for only three months.  She testified that the nerve block did not help her to such an extent that she would be capable of performing her past work.  She testified that she has carpal tunnel syndrome in her right hand, which goes numb and is painful.  She stated that she takes medication for depression and anxiety but was recently able to reduce the dosages of both of those medications.  She avoids narcotic medication and primarily takes Ibuprofen for pain.

## ANALYSIS

### A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[28]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[29]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[28]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[29]      *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[30]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[31]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[32]  Conflicts in the evidence[33] and credibility assessments[34] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[35]

---

[30]   *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[31]   42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[32]   *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[33]   *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[34]   *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[35]   *Wren v. Sullivan*, 925 F.2d at 126.

-13-

B.    ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[36]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[37]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[38]

---

[36]    See 42 U.S.C. § 423(a).

[37]    42 U.S.C. § 1382c(a)(3)(A).

[38]    42 U.S.C. § 1382c(a)(3)(B).

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those listed in the Social Security regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[39]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[40] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[41]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[42]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can

---

[39]    20 C.F.R. § 404.1520.

[40]    20 C.F.R. § 404.1520(a)(4).

[41]    20 C.F.R. § 404.1545(a)(1).

[42]    20 C.F.R. § 404.1520(e).

perform other substantial work in the national economy.[43]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[44]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[45]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[46]

D.   **THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since April 21, 2011.[47]   This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:   cervical degenerative disc disease/spondylosis and radiculopathy, status post anterior cervical discectomy and fusion at C6-7, carpal tunnel syndrome,

---

[43]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[44]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[45]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[46]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[47]     Rec. Doc. 5-1 at 22.

a history of mitral valve prolapse, torn meniscus, and status post right knee surgery.[48] This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[49]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work except that her work should be limited to no more than occasional reaching overhead with bilateral upper extremities.[50]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a medical secretary and medical transcriptionist/biller.[51]  The ALJ made alternative findings at step five, particularly under Medical-Vocational Rule 202.14, and found that the claimant was not disabled from April 21, 2011 through May 21, 2014 (the date of the decision).[52]  The claimant challenges this finding.

---

[48]     Rec. Doc. 5-1 at 22.

[49]     Rec. Doc. 5-1 at 25.

[50]     Rec. Doc. 5-1 at 25.

[51]     Rec. Doc. 5-1 at 30.

[52]     Rec. Doc. 5-1 at 32.

## E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) in failing to account for her severe carpal tunnel syndrome in her residual functional capacity evaluation; (2) in failing to account for her limitations in maintaining neck flexion (looking down) in her residual functional capacity evaluation; and (3) in failing to provide specific reasons supporting her credibility findings.

## F.    DID THE ALJ ERR IN FAILING TO ACCOUNT FOR THE CLAIMANT'S CARPAL TUNNEL SYNDROME IN THE RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT?

Under the regulations and the jurisprudence, the determination of residual functional capacity is a task that is the sole responsibility of the ALJ.[53] In making that determination, the ALJ is required to consider the medical and nonmedical evidence, including a claimant's descriptions of symptoms and limitations.[54] In this case, the ALJ found that the claimant has the residual functional capacity to perform light work with the exception that she is limited to no more than occasional reaching overhead with her arms. The claimant argues that this conclusion failed to take her carpal tunnel syndrome into account.

---

[53]    *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012).

[54]    20 C.F.R. § 404.1545.

The Social Security regulations define light work as involving the ability to lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.[55]  A job may fall into the light work category if it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls, even if the weight required to be lifted is very little.[56]  When a person is capable of performing light work, he is also usually capable of doing sedentary work; if there are limiting factors such as an inability to sit for long periods of time or a loss of fine dexterity, however, a person may be capable of light work but not capable of sedentary work.[57]

The claimant was diagnosed with severe carpal tunnel syndrome in her right arm and mild carpal tunnel syndrome in her left arm in June 2013, eight months before the hearing.  The record contains no evidence that, during that eight month period following diagnosis, she had any further treatment for her carpal tunnel syndrome.  At the time of the diagnosis, Dr. Drerup recommended that she use splints on her arms but he did not recommend surgery, and there is no indication in the medical records showing an objective decrease in the claimant's ability to use her

---

[55]   20 C.F.R. § 404.1567.

[56]   20 C.F.R. § 404.1567.

[57]   20 C.F.R. § 404.1567.

arms in pushing, pulling, fingering, or manipulating objects due to the carpal tunnel syndrome. When the claimant was examined by Dr. Hall just a few months before the diagnosis, in February 2013, she was found to have "two-point discrimination and fine and gross dexterity that was noted to be normal. The patient was noted to have no evidence of sensation or motor abnormality . . . at the bilateral upper . . . extremities."[58] Although the claimant had not yet been diagnosed with carpal tunnel syndrome, Dr. Hall concluded that the claimant's functionality was not impaired by her complaints concerning her arms and hands. A month later, consultant Dr. Emily Eisenhauer concluded that the claimant was unable to work with her arms over her head, based on the claimant's function report, where she indicated that she could not look down for more than an hour at a time, could not work with her arms over her head, and could not lift more than twenty pounds but could still sew and work in her flower beds for limited amounts of time, prepare full meals, do laundry and housework, and do her grocery shopping.[59] The claimant also told Dr. Drerup, in February 2013, that lifting her arms up over her head was painful, and she repeated that at the hearing. The ALJ incorporated this limitation in her residual functional capacity finding.

---

[58]     Rec. Doc. 5-1 at 244.

[59]     Rec. Doc. 5-1 at 164-171.

In the ruling, the ALJ noted that objective testing had revealed carpal tunnel syndrome, and she reviewed Dr. Drerup's treatment note concerning that diagnosis. The ALJ also expressly considered the claimant's hearing testimony, noting in particular that the claimant testified that it is painful for her to hold her arms out or overhead and has experienced hand and arm pain and numbness.  The ALJ also noted that the claimant's carpal tunnel syndrome "has been considered and accounts for the lifting and carrying limitations in the . . . residual functional capacity assessment."[60] There is no evidence in the record suggesting that carpal tunnel syndrome restricts the claimant's functionality in any ways other than that recognized by the ALJ in the ruling.

Accordingly, this Court finds that the ALJ considered the claimant's carpal tunnel syndrome diagnosis and took the evidence concerning limitations attributable to that condition into account when evaluating the claimant's residual functional capacity.  This Court further finds that the ALJ's residual functional capacity determination is based on substantial evidence in the record.

---

[60]     Rec. Doc. 5-1 at 30.

**G.    Did the ALJ Err in Failing to Account for the Claimant's Inability to Maintain Neck Flexion in the Residual Functional Capacity Assessment?**

The claimant contends that, since undergoing cervical spine surgery, she is unable to hold her head down – in other words, in a flexed position – for more than an hour at a time without pain and resulting headaches.  She argues that the ALJ failed to take this into account when concluding that she is capable of performing a limited range of light work.

As noted above, however, there is nothing in the definition of light work that requires a person to be able to look down at something for more than an hour at a time.  Further, while the claimant testified at the hearing that she was unable to successfully return to her prior job following neck surgery because of this, there is no indication in the record that she communicated this problem to Dr. Drerup.  Dr. Drerup did not place any restrictions related to neck flexion on the claimant's activities following surgery.  The record indicates that the claimant saw Dr. Drerup for two follow-up visits after surgery then did not return to see him again for two years.  At the first follow-up visit, the claimant stated that her neck pain was gone, and Dr. Drerup noted only a mild limitation in lateral rotation bilaterally.  At the second follow-up visit, the claimant reported only mild soreness and the mildly limited lateral rotation was again noted.  When the claimant returned to Dr. Drerup

-22-

two years later, after experiencing renewed neck pain after picking up a grandchild, a nerve root block injection was administered in March 2013.  The claimant reported no neck pain to Dr. Drerup in April or June 2013, and the record contains no evidence of any further treatment for her neck despite the fact that she testified at the hearing that her neck pain was resolved for only about three months following the nerve root block injection.  The ALJ expressly noted the claimant's complaint regarding neck flexion in her residual functional capacity evaluation and found it to be inconsistent with the claimant's description of her daily activities.

Accordingly, this Court finds that the ALJ's residual functional capacity assessment took the claimant's subjective complaint regarding pain following neck flexion into consideration and further finds that the ALJ's residual functional capacity assessment is supported by substantial evidence in the record.

## H.   DID THE ALJ ERR IN FAILING TO PROVIDE SPECIFIC REASONS SUPPORTING HER CREDIBILITY FINDINGS?

The ALJ concluded that the claimant has medically determinable impairments that could reasonably be expected to cause her alleged symptoms, but opined that the claimant's statements regarding the intensity, persistence, and limiting effects of her

-23-

symptoms were not entirely credible.[61]  The claimant now argues that the ALJ erred because she failed to set forth specific reasons supporting her credibility findings.

"[T]he ALJ is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly."[62]  More particularly, "[i]t is within the ALJ's discretion to determine the disabling nature of a claimant's pain," and "considerable deference" is accorded to such a determination.[63]  When an ALJ's credibility determination is supported by substantial evidence, it is entitled to judicial deference.[64]

In this case, the ALJ set forth a detailed summary of the medical and nonmedical evidence in the record.  She then noted that the reason she found the claimant lacking in credibility as to the limitations resulting from her carpal tunnel syndrome and her alleged inability to flex her neck for more than an hour at a time is because her activities of daily living are inconsistent with the alleged limitations.[65]  Thus, the ALJ did provide specific reasons in support of her credibility findings and did cite evidence in support of her credibility findings, as required by the Social

---

[61]    Rec. Doc. 30 at 294.

[62]    *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

[63]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

[64]    *Villa v. Sullivan*, 895 F.2d at 1024.

[65]    Rec. Doc. 5-1 at 30.

Security regulations.  Therefore, this Court further finds that the ALJ's conclusion regarding the claimant's credibility is supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, this Court finds that the decision of the Commissioner is AFFIRMED, and this matter is DISMISSED WITH PREJUDICE.

Signed at Lafayette, Louisiana, on this 25th day of January 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE